**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO.  05-398** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **EDWARD ROSS** | : | |

<u>**MEMORANDUM AND ORDER**</u>

GENE E.K. PRATTER, J.                                                    AUGUST 31, 2007

A federal jury convicted Defendant Edward Ross of four counts of distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Counts I-IV), one count of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count V), one count of use of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count VI), one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count VII), one count of possession of a machine gun, in violation of 18 U.S.C. § 922(o) (Count VIII), and two counts of possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (Counts IX and X).

Mr. Ross now moves pursuant to Rule 29 for a judgment of acquittal on Counts V-X of the superceding indictment.  In the alternative, he moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Because the evidence was sufficient to warrant a conviction on the challenged counts, and because Mr. Ross received a trial that comported with the notions of justice, fundamental fairness, and due process, the Court will deny both motions.

I.    FACTUAL BACKGROUND

Detective John Newell of the Delaware County District Attorney's Office Drug Task Force began an investigation into Mr. Ross's drug trafficking activities in December 2003.  The Government introduced evidence at trial that between March 25, 2004 and April 23, 2004, Detective Newell set up five different face-to-face meetings with Mr. Ross to purchase cocaine. The first meeting took place at a residence at 21st and Providence Streets in the City of Chester. Detective Newell testified that he purchased $250 of cocaine from Mr. Ross during this encounter and that Mr. Ross provided him with his telephone number so that the Detective could easily reach him for future purchases.

On April 1, 2004, Detective Newell contacted Mr. Ross at the telephone number he had provided, and arranged to purchase cocaine for the second time.  Simultaneously, the Detective's colleagues surveilled a residence located at 2115 Madison Street, which they suspected to belong to Mr. Ross.  The surveilling officers observed Mr. Ross exit the back door of the first floor of 2115 Madison Street, and enter a green Chevrolet Monte Carlo.  The officers followed him directly to a Sunoco gas station at 22nd and Edgemont Streets – the meeting place he and Detective Newell had chosen – where he sold the Detective cocaine at the price of $430.  Before he left, Detective Newell arranged another meeting with Mr. Ross to purchase more cocaine, and on April 15, 2004, Detective Newell and his colleagues repeated the same transaction and surveillance process and made the same observations, except that Mr. Ross charged $450 for the cocaine.

On April 22, 2004, Detective Newell set up a fourth transaction with Mr. Ross.  The surveilling officers testified that they again observed that Mr. Ross left directly from 2115

Madison Street via the back door, and traveled without stopping to the same rendezvous location at the Sunoco at 22nd and Edgemont Streets.  This time, Mr. Ross drove a Silver Pontiac.  After Mr. Ross sold Detective Newell $240 worth of cocaine, he agreed to meet again the next day for what was planned to be a fifth transaction.

On April 23, 2004, Detective Newell prepared a search warrant for 2115 Madison Street, and then telephoned Mr. Ross to arrange to purchase one half-ounce of cocaine for $500.  Mr. Ross left 2115 Madison through the back door, and got into the Silver Pontiac.  However, before Mr. Ross could drive away from the residence to meet Detective Newell, Detective Sponaugle and Sergeant Boudwin, the officers who had surveilled Mr. Ross since the beginning of the investigation, stopped and arrested Mr. Ross in the driveway.

Detective Sponaugle approached the driver's side door of the car.  He testified that he saw that Mr. Ross was looking down towards his seat and that his hands were underneath his thighs.  Detective Sponaugle removed Mr. Ross from the car, and found four small bags of cocaine on top of the driver's seat, underneath where Mr. Ross's thighs and hands had been.  Sergeant Boudwin seized the bags of cocaine and turned the off the car.  As he did so, he noticed that there was a gun approximately six to eight inches under the driver's seat.  He retrieved the gun, which was a fully-loaded Colt .38 caliber revolver.  He also retrieved the car keys.

Sergeant Boudwin escorted Mr. Ross to a police van, articulated Miranda warnings, and informed him that the police had a warrant to search 2115 Madison Street.  According to Sergeant Boudwin's testimony, after Mr. Ross acknowledged that he understood his rights, Sergeant Boudwin asked Mr. Ross whether there was anyone inside the residence at 2115 Madison Street and whether he lived there.  Mr. Ross answered that he lived at 2115 Madison

-3-

Street, and that no one was inside the premises.  Mr. Ross then showed Sergeant Boudwin which

of the keys on the key ring the officer had taken from the ignition of the car was the key to 2115

Madison.  After knocking and announcing their identity and purpose, the officers entered the

residence at 2115 Madison through the back door they had observed Mr. Ross to use previously.

A sweep of the premises revealed that there were no other individuals present.  Inside a

bedroom in the residence, the police found the following indicia of residency: (1) a dry cleaning

receipt with Mr. Ross's last name on it; (2) a PECO bill with the name Edward Ross, addressed

to 2115 Madison Street; (3) a bank statement in the name of Mr. Ross's daughter, with Mr. Ross

as the account custodian, addressed to 2115 Madison Street; (4) clothing consistent with the size,

shape and style of the clothing Mr. Ross was wearing at the time of his arrest; (5) photographs of

Mr. Ross and his daughter; (6) clothes of a young female child consistent with the size and age of

Mr. Ross's daughter; and (7) a "Protection from Abuse Order," filed by the Defendant,

prohibiting the mother of his daughter from entering the residence 2115 Madison Street, as well

as Mr. Ross's mother's home at 2210 Providence Avenue.

The officers also recovered additional firearms and cocaine from within the residence.

The back door of the residence used by the officers to gain entry opened directly into the kitchen.

In plain view, on the kitchen counter top, the officers found approximately an ounce and a half of

pre-bagged cocaine, hundreds of new and unused baggies of various sizes, a .25 caliber semi-

automatic handgun, five digital scales, and a large Ohaus triple beam scale.  Some of the bags on

the counter were marked with a blue star, similar to the marking that appeared on several of the

bags of cocaine the officers found in the car.  In the living room, Sergeant Boudwin discovered

over 600 grams of cocaine and a .9mm, loaded, modified semi-automatic weapon, hidden in the

drop ceiling.

During trial, Officer David Tyler, a stipulated expert in the field of narcotics and violent crimes, testified that based on the quantity of drugs seized from the residence, the packaging materials, the firearms and the scales found at the residence, Mr. Ross was engaging in distribution activities rather than personal use of cocaine.  With regard to the firearms found in the car and in the house, experts from the Bureau of Alcohol, Tobacco and Firearms testified that the guns were manufactured outside of the Commonwealth of Pennsylvania and, specifically, that the .9 mm weapon met the federal definition of a machine gun.

At trial, after the Government rested its case-in-chief, the defense moved for judgment of acquittal on the grounds that the evidence was insufficient as a matter of law to support a guilty verdict.  The Court denied the motion.  The jury found Mr. Ross guilty on all ten counts of the Superseding Indictment.

Mr. Ross now argues that no reasonable jury could have concluded that the Government proved the following beyond a reasonable doubt: (1) that he constructively possessed the drugs and guns allegedly seized from 2115 Madison Street and the car; (2) that he possessed the seized guns in furtherance of a drug trafficking crime; or (3) that the guns he possessed substantially affected interstate commerce.

In the alternative, Mr. Ross argues that he was deprived of his right to a fair trial and the Court must grant him a new trial due to the following errors: (1) the introduction into evidence of nine out of twelve photographs the Government did not produce prior to trial, in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963), Giglio v. United States, 405 U.S. 150, 154 (1972) and Rule 16 of the Federal Rules of Criminal Procedure; (2) the failure of the Court to allow the

defense to admit bad acts evidence and evidence of bias pertaining to the Government's principle

law enforcement witnesses; and (3) the Court's failure to remove Special Assistant United States

Attorney Katayoun Copeland as the prosecutor for the case.

## II.   RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL[1]

Mr. Ross claims that the evidence presented at trial is insufficient to establish the

essential elements of his drug trafficking and gun possession charges.  He moves on this basis for

a judgment of acquittal.

### A.   LEGAL STANDARD

If a jury returns a guilty verdict, "the court may set aside the verdict and enter an

acquittal" if the evidence presented at trial was insufficient as a matter of law to support

conviction.  Fed. R. Crim. P. 29(c)(2); U.S.v. Cohen, 455 F. Supp. 843, 852 n. 7 (E.D. Pa. 1978),

aff'd, 594 F.2d 855 (3d Cir. 1979).  The Court must "review the record in the light most

favorable to the prosecution to determine whether *any* rational trier of fact could have found

proof of guilt beyond a reasonable doubt based on the available evidence."  U.S. v. Smith, 294

F.3d 473, 476-77 (3d Cir. 2002) (citing U.S. v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001))

(emphasis added).  The Court is required to "draw all reasonable inferences in favor of the jury's

verdict."  Id. at 477 (citing U.S. v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996)), and any finding

of insufficiency should "be confined to cases where the prosecution's failure is clear."  Id.

(citing U.S. v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).[2]

---

[1]Mr. Ross has timely moved for post trial relief pursuant to the Court's Order dated July 14, 2006.

[2]To the extent this argument by Mr. Ross implicates evidence he contends should not have been admitted, the Court incorporates Section III C., *infra*, in this discussion.

### B.     CONSTRUCTIVE POSSESSION OF THE FIREARMS AND COCAINE

Mr. Ross first argues that the evidence presented at trial is insufficient to enable a rational trier of fact to conclude that he possessed the illegal drugs and firearms that are the subject of his conviction.  In light of the fact that Mr. Ross was not found in actual contemporaneous possession of any of the cocaine or firearms giving rise to the challenged charges in Counts V-X against him,[3] the precise issue for the Court is whether there is sufficient evidence to prove that he had constructive possession of the contraband.

To establish constructive possession, the Government must present "sufficient evidence to support an inference that the individual 'knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.'"  U.S. v. Brown, 3 F.3d 673, 680 (3d Cir. 1993) (quoting U.S. v. Iafelice, 978 F.2d 92, 96 (3d Cir. 1992)).  "Dominion and control are not established  . . . by 'mere proximity to the [contraband], or mere presence . . . where it is located or mere association with the person who does control the [contraband].'"  U.S. v. Garth, 188 F.3d 99, 112 (3d Cir. 1999) (quoting U.S. v. Jenkins, 90 F.3d 814, 818 (3d Cir. 1996)).   However, both direct and circumstantial evidence are acceptable methods of proof of constructive possession, as are inferences from established facts, as long as there is a "logical and convincing" connection between the facts and the conclusion.  U.S. v. Bellinger, 461 F. Supp. 2d 339, 347 (E.D. Pa. 2006) (quoting U.S. v. McNeill, 887 F.2d 448, 450 (3d Cir. 1989)).

The Court will address whether the evidence is sufficient to support the jury's conclusion

---

[3]Mr. Ross's motion does not encompass Counts I-IV which covered his sales of cocaine to Detective Newell.

that Mr. Ross constructively possessed the items seized from the silver Pontiac where he was arrested, and from the residence at 2115 Madison Street, seriatim.

> **i.   POSSESSION OF THE COCAINE AND THE COLT .38 REVOLVER SEIZED FROM THE CAR**

The Delaware County Task Force officers seized a Colt .38 revolver and four small bags of cocaine from the silver Pontiac when they arrested Mr. Ross on April 23, 2004.  There is substantial evidence, viewed in the light most favorable to the Government, for a rational juror to conclude beyond a reasonable doubt that Mr. Ross constructively possessed both the cocaine and the revolver found in the Pontiac.

The record is replete with evidence to attribute possession of the cocaine in the silver Pontiac to Mr. Ross.  Seargeant Boudwin testified that the officers discovered the cocaine on top of the driver's seat of the car and that he saw Mr. Ross with his hands under his legs.  A juror need not draw a complex or extenuated inference to establish that Mr. Ross knew that the cocaine was under his leg.  See, e.g., U.S. v. Gonzalez, 2003 WL 735096, at *3 (E.D. Pa. Mar. 6, 2003).  Nor must the jury attempt an illogical leap of faith, in the context of the circumstances under which Mr. Ross was arrested – en route to sell cocaine to Detective Newell –  to conclude that Mr. Ross intended to exercise dominion over these drugs.

Likewise, the record also contains sufficient evidence that Mr. Ross knew the Colt .38 revolver was under his seat inside the car, and that he intended to exercise control over the firearm, which was within his reach.

Although mere proximity is not enough to establish constructive possession, when contraband is found in an automobile, control of the vehicle is a significant factor, as "[c]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the

objects in his or her vehicle of which he or she is aware, and usually knows what is in that vehicle." U.S. v. White, 2007 WL 1409337, at *2 (E.D. Pa. May 11, 2007) (quoting Iafelice, 978 F.2d at 97). "However, simple ownership or control of a vehicle is insufficient on its own to establish constructive possession of an item in the vehicle." Id. (citing Brown, 3 F.3d at 683). Thus, evidence of ownership or control of a vehicle must be supported by additional factors tending to connect an individual to the contraband seized from a vehicle. Id. (citing Brown, 3 F.3d at 683).

The additional factors that support an inference of constructive possession include the surrounding circumstances of the seizure, Iafelice, 978 F.2d at 96-9, whether the defendant had continuous access to the vehicle, see U.S. v. Figueroa, 2000 WL 1341923, at *3 (E.D. Pa. Sept. 18, 2000) (continuous and easy access to a vehicle indicates substantial control over that vehicle, and permits the inference that the driver "tends to know what objects are in that vehicle and tends to have dominion and control over those objects"), whether the contraband was accessible to others, and whether the firearm was in the defendant's grab area. All of these additional factors that support the inference of constructive possession are present here.

The Government presented evidence at trial that Mr. Ross had primary and continuous access to the silver Pontiac. Rene Ross, the Defendant's mother, testified that she had purchased the Pontiac – which became the third vehicle concurrently registered to her – on April 16, 2004, just a week prior to Mr. Ross's arrest. She also testified that her immediate family was made up of three people, herself, her son (Mr. Ross) and a daughter, and that she gave Mr. Ross permission to use the Pontiac, day or night. Consistent with her testimony, on each occasion after Mrs. Ross purchased the Pontiac, Mr. Ross used the car to meet with Detective Newell to

sell him cocaine.  It is entirely reasonable for the jury to infer that Mrs. Ross purchased the third

car for her son, or that it was otherwise dedicated to his use, and thus that Mr. Ross had both

continuous access and primary access to the Pontiac.

Of course, inasmuch as Mr. Ross was alone in the car at the time of his arrest, it is also

clear that the firearm was not easily accessible to other persons.  See Bellinger, 461 F. Supp. 2d

at 347 (lack of accessibility of the firearm to others is a "plus factor").

Additionally, both the circumstances surrounding the seizure of the revolver, and its

location in the vehicle, suggest the jury's conclusion is owed deference.  Sergeant Boudwin

testified at trial that he reached into the car to turn off the ignition and could see the gun from this

vantage point, approximately six to eight inches underneath the driver's seat.  Therefore, the gun

was in Mr. Ross's "grab area." See U.S. v. Lopez, 271 F.3d 472, 488 (3d Cir. 2001); Figueroa,

2000 WL 1341923, at *4 (finding that the visibility of gun under the driver's seat indicates

knowledge and control over the gun).

Of course, the Colt .38 did not appear underneath Mr. Ross's seat under benign

circumstances.  A reasonable inference from the factual context of his arrest is that the officers

effected their "take down," and interrupted Mr. Ross while on his way to sell cocaine to

Detective Newell.  Thus, the revolver was conveniently placed in Mr. Ross's "grab area" under

suspicious circumstances.  See Bellinger, 461 F. Supp. 2d at 349 (citing Iafelice, 978 F.2d at 97)

(finding that "[w]hen coupled with proximity to the contraband and control over a vehicle,

suspicious behavior also weighs in favor of finding that occupants had knowledge of contraband

inside").[4]  Moreover, the Government presented evidence to the jury that linked the presence of the gun to Mr. Ross's suspicious activity.  Officer Tyler testified that "just like a carpenter will have a hammer, a drug dealer is going to have a gun."  (Tr. 5/12/2006 21:14-15.)

Finally, there was no evidence or suggestion of a competing explanation for the origin of the gun.  In the absence of any credible explanation for the presence of the firearm, and in the presence of multiple plus factors in addition to his exclusive control over the vehicle, a reasonable jury could infer that Mr. Ross knew of, and exercised dominion over the Colt .38 revolver.

### ii.   POSSESSION OF CONTRABAND SEIZED FROM WITHIN 2115 MADISON STREET

Mr. Ross next contends that the evidence is insufficient to prove that he constructively possessed the 621 grams of cocaine, .9mm modified machine gun, and the .25 caliber weapon found within the residence at 2115 Madison Street.

Because Mr. Ross was not arrested inside the Madison Street residence, the Government relied entirely on circumstantial evidence to connect him to the contraband found in the house.  Where the Government relies wholly on circumstantial evidence to prove constructive possession, the Court must determine, based on the quantitative and qualitative judicial guideposts, whether the evidence, accumulated "grain-by-grain," has tipped the scale of

---

[4]Contrary to Mr. Ross's assertion, there is no requirement that proximity must be coupled with evasive conduct to support an inference of constructive possession.  Though evasive conduct may raise suspicion, see, e.g., Iafelice, 978 F.2d at 97; see also U.S. v. Littlejohn, 2007 WL 1745310, at *3 (D.C. Cir. June 19, 2007), which, coupled with proximity, may suffice to raise a reasonable inference of constructive possession, the fact that Mr. Ross did not attempt to flee or hide the contraband found in the Pontiac does not, in itself, render the evidence in this case insufficient.

sufficiency.  Iafelice, 978 F.2d at 98.  Mr. Ross argues that a comparison of the evidence in this

case to the quantity of evidence and the factual scenarios of guiding precedent, namely, Brown,

and Jenkins, inevitably renders the evidence in this case insufficient to tip the scale.

In both Jenkins and Brown, which were direct appeals in drug constructive possession

cases, the Third Circuit Court of Appeals found that the evidence was not sufficient to sustain

convictions.  In Jenkins, the defendant was charged with constructive possession of drugs in an

apartment of which he was not the lessee.  See Jackson v. Byrd, 105 F.3d 145, 149 (3d Cir. 1997)

(citing Jenkins, 90 F.3d at 820).  Similarly, in Brown, appellant Ama Baltimore was charged with

constructive possession of drugs in a house to which she had access and in which she resided

along with several others, though none of her possessions were found in rooms where drugs were

seized.

In contrast to both Brown and to Jenkins, there is ample evidence in this case supporting

the conclusion that Mr. Ross was the sole resident at 2115 Madison Street, rather than merely a

guest or a co-resident of the premises.  Mr. Ross admitted to Sergeant Boudwin that he lived at

2115 Madison Street; he possessed a key to the residence; and his belongings were the only

indicia of residency recovered from within the house.[5]  The only bedroom in the residence

contained Mr. Ross's clothing, legal documents, bills, personal photographs of himself and his

daughter, and clothing for his minor daughter.

Three witnesses testified on behalf of Mr. Ross to contradict the Government's

_____

[5]In United States v. Abbott, 451 F. Supp. 2d 657, 663 (E.D. Pa. 2006), the court found
that possession of a key to a residence in itself indicates both dominion over the residence and
constructive possession of the contraband found therein.  However, here the Court considers the
evidence of Mr. Ross's key as significant, though not conclusive, evidence that he resided
regularly at 2115 Madison Street.

proposition of his residence at 2115 Madison Street: Mr. Ross's mother, Rene Ross, his sister, Crystal Ross, and his uncle, Warren Morton.

Both Rene and Crystal Ross testified that Mr. Ross lived with the two of them at 2210 Providence Avenue on April 23, 2004, and not at 2115 Madison Street.  Mr. Morton testified that on April 23, 2004 he lived at 2115 Madison Street along with his nephew, James Morton, and, that although Mr. Ross was a frequent visitor, he was not an occupant of the residence.  Mr. Morton also testified that he lived alone with his nephew at 2115 Madison until the fall of 2004, at which time he relocated to an apartment where he had never previously resided at 336 West 8th Street.

However, the prosecution presented testimony to impeach Mr. Morton's credibility. Specifically, Mr. Morton's probation officers, Jeffrey Roney and Stacie Nickerson, testified that as early as 2002, Mr. Morton informed the Delaware County Probation office that he lived at 336 West 8th Street.  Furthermore, Mr. Roney testified that he visited Mr. Morton at West 8th Street in August of 2003, and that Mr. Morton's address remained listed as 336 West 8th Street in the probation database until the termination of his supervision in 2005.

The jury was entitled to determine the weight to be accorded to the testimony of Rene and Crystal Ross and Mr. Morton, and to assess the credibility of the witnesses.  It is not for the Court to substitute its judgment in this process.  U.S. v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citing U.S. v. Jannotti, 673 F.2d 578, 581 (3d Cir.) (en banc), cert. denied, 457 U.S. 1106 (1982) ("Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.")).  See also  2A Charles A. Wright, Fed. Prac. & Pro. (Criminal 3d) § 467 at

311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient . . . It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").

Together, the indicia of residency found in the only bedroom of 2115 Madison, and Mr. Ross's admission that he lived there, along with the testimony that he had a key to the residence, is sufficient evidence to support a reasonable inference that Mr. Ross lived alone at 2115 Madison Street.  See U.S. v. Ingram, 207 F. App'x 147, 153 (3d Cir. 2006) (finding that it was reasonable for the jury to infer that the defendant was the lone resident in an apartment, despite the fact that he was not the lessee of the apartment, where the defendant's belongings were found in the only occupied bedroom, and his girlfriend admitted to staying there "on occasion").

Moreover, in contrast to both Brown and Jenkins, there is also significant evidence linking Mr. Ross to the contraband found within 2115 Madison Street.  Contrary to Jenkins, where the police arrived in the apartment in pursuit of a fleeing individual suspected of firing miscellaneous gunshots, and to Brown, where the investigation into the pertinent drug trafficking activities began with confidential information pointing to her co-defendant, Mr. Brown, and to others, but not to Ms. Baltimore, the discovery of the contraband found within 2115 Madison street resulted from a targeted investigation of Mr. Ross.  See Ingram, 207 F. App'x at 149-51 (finding that evidence of a similar "buy-bust" operation is additional evidence linking defendant to drugs).  Furthermore, unlike both Brown and Jenkins, there were no other adults inside or near to 2115 Madison Street when the officers recovered the drugs and guns, nor was there any competing explanation for the origins of the contraband.

Of course, having found it reasonable for the jury to conclude that Mr. Ross was the only

-14-

occupant of the residence, it follows that the jury could reasonably conclude that he was aware of, and exercised control over all of the contents therein.  Because of his sole occupancy at 2115 Madison, it is of no import, unlike in <u>Brown</u>, that Mr. Ross's personal belongings were recovered from a different room than the contraband.  The fact that some of the drugs, paraphernalia and one of the firearms appeared in plain view on the kitchen counter is even stronger evidence of constructive possession.  <u>See</u> <u>U.S. v. Johnson</u>, 2007 WL 666566, at *4, (D.C. Cir. Feb. 28, 2007) (finding that a defendant's ownership of or residence in premises where drugs are found in plain view is, in some cases, sufficient evidence in and of itself of dominion and control to establish constructive possession).   However, it is not necessary that the drugs be out in the open to support the inference of constructive possession.  Along with the chain of supported inferences beginning with Mr. Ross's string of transactions with Detective Newell, all originating from 2115 Madison, the similarity of the markings on the bags of cocaine in the Pontiac and those on the kitchen counter of the residence, Officer Tyler explained to the jury that drug traffickers often keep their "stashes" in different locations, and that they might have one "workstation" such as the kitchen, apart from where they store the bulk of their drugs elsewhere in the same building.   (Tr. 5/12/06 34-35.)

The Court concludes that there was sufficient evidence to enable the jury to determine that Mr. Ross lived alone at 2115 Madison Street and, taken together with the evidence of his drug trafficking activities, all originating from 2115 Madison Street, that he constructively possessed the drugs and contraband found there by the law enforcement personnel.

### C.   POSSESSION OF FIREARMS IN FURTHERANCE OF A DRUG TRAFFICKING CRIME (18 U.S.C. § 924 (C)(1)(A))

Mr. Ross next argues that there was insufficient evidence to support his conviction under

Counts VI and VII of the superceding indictment for violation of 18 U.S.C. § 924(c)(1).  In Count VI, the Government charged Mr. Ross with knowingly using or carrying the Colt .38 revolver during, and in relation to, his drug trafficking crime.  In Count VII, the Government charged Mr. Ross with knowingly possessing the .9mm converted machine gun and the .25 mm semiautomatic pistol in furtherance of his drug trafficking crime.

Section 924(c)(1) criminalizes the possession of a firearm in furtherance of a drug trafficking crime for which a person may be prosecuted in a federal court, and provides in relevant part that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime [be sentenced to additional punishment]."  18 U.S.C. § 924(c).

The "mere presence" of a firearm is not enough to support a conviction under § 924(c). Instead, the evidence must demonstrate a connection between the drug trafficking activity and the weapon, such that the weapon "helped forward," or advanced or promoted the crime.  U.S. v. Perez, 2007 WL 2189397, at *7 (3d Cir. Jul. 31, 2007); U.S. v. Sparrow, 371 F.3d 851, 853 (3d Cir. 2004).

Our court of appeals has held that the following "nonexclusive factors" are relevant to the determination of whether possession of a firearm was in furtherance of a drug trafficking crime: "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which

-16-

the gun is found." <u>Sparrow</u>, 371 F.3d at 853 (<u>citing</u> <u>U.S. v. Ceballos-Torres</u>, 218 F.3d 409, 414-15 (5th Cir. 2000)).  Immediate accessibility by the defendant to a weapon is not a requirement for a § 924(c) conviction,  <u>Perez</u>, 2007 WL 2189397, at *7 (<u>citing</u> <u>Sparrow</u>, 371 F.3d at 854) (affirming a conviction under § 924(c) in a case in which law enforcement officers found a firearm hidden in a compartment underneath floor tiles along with nine bags of marijuana and $140 cash), though strategic accessibility of the weapons to the drugs is relevant.  <u>U.S. v. Rios</u>, 449 F.3d 1009, 1013 (9th Cir. 2006).

The Government has presented evidence to satisfy nearly all of the "nonexclusive" factors germane to establishing a conviction under § 924(c).  As a convicted felon, Mr. Ross was not entitled to legally or legitimately possess a firearm, making his possession of one (or more) furtive.  He possessed firearms at each and every location where he possessed drugs.  The police discovered the .9mm modified machine gun strategically placed together with the 621 grams of cocaine in the drop ceiling and the .25 caliber semiautomatic pistol on the kitchen counter along with cocaine, and paraphernalia used for preparing the cocaine for sale.  Both weapons were found loaded.

The Government also presented expert testimony regarding the type of weapons and their use  in relation to the kind of drug activity taking place.  Officer Tyler testified that the amount of cocaine and drug paraphernalia in the residence was consistent with the existence of an operation to traffic in illegal drugs.  Further, he explained that it is usual for individuals engaged in this type of drug trafficking operation to have multiple guns, each in close proximity to their various stashes for the purpose of easy access and protection of the stash.  He also testified that semi-automatic pistols and modified machine guns are the type of weapons that are commonly used by

drug traffickers in the City of Chester.

Though taken alone, expert testimony may not suffice to support the contention that a weapon was possessed "in furtherance" of a crime, see, e.g., Rios, 449 F.3d at 1013-14 ("[s]tanding on its own, [evidence tying the firearm to the promotion of a drug crime in the form of expert testimony that drug dealers often carry firearms to protect their drugs, money and themselves] may be insufficient to meet the 'in furtherance of' test") (quoting H.R. Rep. No. 105-344, 1997 WL 668339, at *12 (1997)), the Government here presented more than general evidence to support the fact that Mr. Ross possessed the firearms in furtherance of his drug trafficking activities.  In fact the Government has presented particularized evidence satisfying nearly every factor of the multi-factor test employed in this circuit.[6]  Therefore, the Court finds that the evidence was sufficient to support the jury's conclusion that Mr. Ross carried or possessed the various weapons in furtherance of his drug trafficking crime.

_____D.    ACQUITTAL UNDER 18 U.S.C. § 922(O)

Mr. Ross next challenges his conviction for possession of a machine gun in violation of § 922(o) on the grounds that the law is both facially unconstitutional and unconstitutional as applied to the facts of this case.

---

[6]Although Mr. Ross has challenged his conviction under both Counts VI and VII, his argument primarily focuses on the weapons recovered from within 2115 Madison Street, and his conviction for "possession" of these weapons in furtherance of the crime.  Mr. Ross touches briefly upon the Colt .38 found in the Pontiac, and argues, without citation to authority, that the gun was simply too far under the seat to support a conviction for the "use" or "carrying" of a firearm.  "Carrying" a firearm includes a person who knowingly possesses a firearm in a vehicle. Garth, 188 F.3d at 111 (citing Muscarello v. U.S., 524 U.S. 125, 128 (1998)).  Even a gun concealed in glove compartment may be "carried" in furtherance of a crime.  Id. (citing Muscarello, 524 U.S. at 128.)  It was reasonable for the jury to conclude, given the evidence that Mr. Ross was actively using this car to distribute drugs, that the firearm was facultative of his protection, and that its position six inches under his seat was consistent with this purpose.

Mr. Ross contends that in light of United States v. Lopez, 514 U.S. 549 (1995), which held unconstitutional 18 U.S.C. § 922(q), the law banning knowing possession of a firearm in a school zone, § 922(o) is also an unconstitutional exercise of the Commerce Clause power vested in Congress. Specifically, Mr. Ross argues that § 922(o) is unconstitutional for three of the same reasons as the school zone prohibition: (1) like § 922(q), Congress failed to include a jurisdictional element requiring a connection between the gun and interstate commerce as a component of § 922(o); (2) the enactment of both § 922(o) and § 922(q) was unsupported by legislative findings regarding the impact of the possession of machine guns upon interstate commerce; and (3) both sections criminalize the possession of machine guns.

In United States v. Rybar, 103 F.3d 273 (3d Cir. 1996), cert. denied, 522 U.S. 807 (1997), the Third Circuit Court of Appeals confronted the very question now posed by Mr. Ross. In considering Mr. Rybar's Lopez-based challenged to § 922(o), the court distinguished possession of a machine gun from the school zone statute:

> In suggesting that this case is like Lopez, where the Court found that possession of a gun in a local school zone had an insubstantial effect on interstate commerce, the dissent disregards a significant distinction. The statute at issue in Lopez attempted to regulate possession of guns only inside school zones – a discrete area unlikely to have a meaningful aggregate effect on commerce. By contrast, the regulation effected by § 922(o) is not limited to possession "on one's own property," Dissent, at 291; it regulates possession of a class of firearms-machine guns – in a much more dispersed and extensive area. Congress could reasonably have concluded that such a general ban of possession of machine guns will have a meaningful effect on interstate commerce that would be more substantial than the effect of banning possession within school zones.

Id. at 282. The court concluded that the rationale of Lopez did not extend to the congressional ban on intrastate possession of machine guns, and upheld § 922(o). Id. at 279.

It is the responsibility of this Court to follow directly applicable precedent, unless the

rationale underlying the precedent has been wholly undermined by subsequent caselaw.  In

United States v. Singletary, 268 F.3d 196, 205 (3d Cir. 2001), a Commerce Clause challenge to

the felon-in-possession statute, 18 U.S.C. § 922(g)(1), the Court of Appeals employed the sharp

edge of the doctrine of *stare decisis* in recognizing that "even if directly applicable precedent has

been weakened by pronouncements in subsequent decisions," the court may not "precipitate its

decline," and must leave to the higher court itself "'the prerogative of overruling its own

decisions.'" (citations omitted).

In the wake of subsequent Supreme Court decisions, Rybar and § 922(o) stand on firm

ground.  The law has withstood a facial challenge in this circuit based on United States v.

Morrison, 529 U.S. 598 (2000), in which the Supreme Court invalidated 42 U.S.C. § 13981 –  a

statute that established a private cause of action for gender-motivated violence  –  on the grounds

that the statute was in no way connected to "economic activity."  Swida v. U.S., 180 F. Supp. 2d

652, 657 (M.D. Pa. 2002).  More recently, § 922(o) withstood an as-applied challenge in United

States v. Stewart, 451 F.3d 1071 (9th Cir. 2006).  There, although the Ninth Circuit Court of

Appeals had previously found § 922(o) to be an impermissible exercise of Congress's commerce

power, upon remand from the Supreme Court to reconsider its decision in light of Gonzalez v.

Raich, 545 U.S. 1 (2005), the court concluded that the law was constitutional.[7]

Inasmuch as there is direct appellate authority contravening the argument that § 922(o) is

---

[7]The Stewart court reasoned that based on Raich, while § 922(o) ostensibly regulates a
purely local activity, it is nevertheless a valid exercise of Commerce Clause power because
Congress may regulate purely local activities that are part of an economic class of activities
bearing a substantial effect on interstate commerce.  Based on Raich, the *de minimus* character of
the individual instances of possession of machine guns "is of no consequence" to the reach of
Congress' s regulation because Congress' failure to regulate that class of activity would undercut
the regulation of the interstate market.  Stewart, 451 F.3d at 1075-77.

unconstitutional, Mr. Ross's argument in this regard must fail.

### E.    ACQUITTAL UNDER 18 U.S.C. § 922(g)(1)

Along similar lines, Mr. Ross next moves for a judgment of acquittal on Counts IX and X of the Superseding Indictment, charging unlawful possession of a firearm by a convicted felon. His argument is twofold.  First, Mr. Ross contends that § 922(g)(1) is unconstitutional because it proscribes conduct – the intrastate possession of a firearm – that does not have a substantial effect on interstate commerce.  Alternatively, Mr. Ross submits that the Government presented insufficient evidence to show that his possession of firearms had any impact upon interstate commerce.[8]

Similar to his challenge to § 922(o), Mr. Ross's facial challenge to the constitutionality of § 922(g)(1) must fail.  Our court of appeals upheld the constitutionality of § 922(g) in United States v. Singletary, 268 F.3d 196 (3d Cir. 2001).  See also U.S. v. Coward, 296 F.3d 176, 183 (3d Cir. 2002) (declining en banc review of a facial challenge to the constitutionality of § 922(g)(1)).  Mr. Ross acknowledges that Singletary is controlling.  There is no basis for changing course with this case, and thus, we adhere to Singletary, and reject Mr. Ross's facial attack on § 922(g)(1)'s constitutionality.

In Singletary the Court of Appeals also addressed an evidentiary challenge to the interstate nexus requirement similar to the one Mr. Ross levies here.  Considering the Supreme Court case of Scarborough v. United States, 431 U.S. 563 (1977), the Singletary court held that the type of evidence contemplated by the nexus requirement of the § 922(g)(1) is proof that the

---

[8]Mr. Ross stipulated to having been previously convicted of a crime punishable by imprisonment for a term exceeding one year.

possessed firearm previously traveled in interstate commerce, "however remote in the distant past." 268 F.3d at 200.

The Government presented sufficient evidence to prove that all three of the firearms possessed by Mr. Ross had, at some prior time, traveled across state boundaries. Special Agent Barry DeProsperis, an expert in the fields of Interstate Nexus Analysis and origin, identification and function of firearms, testified at trial that the Colt .38 revolver was manufactured in Hartford, Connecticut, and the .25 caliber semiautomatic pistol was either manufactured in or imported into Miami, Florida. (Tr. 5/12/06 71-74.) Agent Richard D. Craze, an expert in the fields of firearms identification, operation and design, from the Bureau of Alcohol Tobacco and Firearms, testified that the .9mm weapon had been converted into a machine gun, that its frame was manufactured in Atlanta, Georgia and its body was manufactured in Buffalo, New York. Of course, Mr. Ross possessed these weapons in the Commonwealth of Pennsylvania. This is exactly the same type of evidence that satisfied the court in <u>Singletary</u>, 268 F.3d at 198, and this Court will not heighten the Government's obligation here.

## III.   RULE 33 MOTION FOR A NEW TRIAL

Mr. Ross also moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The entire basis for this Motion is the Court's exclusion of certain evidence relating to Mr. Ross's subsequent arrest on July 29, 2004 for drug distribution activities, which was in no way the subject of the charges germane to this prosecution.

The same officers from the Delaware County Task Force who arrested Mr. Ross in April 2004, arrested him again on July 29, 2004 for a cocaine transaction. According to the Government, the officers again encountered Mr. Ross selling cocaine in the parking lot of a local

convenience store.  During the July arrest, Mr. Ross alleges the officers engaged in a variety of

mistreatment and misconduct.  In particular, he alleges that the officers handcuffed and

interrogated him without first administering Miranda warnings.  He also claims that the officers

repeatedly harassed him regarding their discontent not to have retrieved any money during the

April 23, 2004 search of 2115 Madison Street.  According to Mr. Ross, the officers threatened to

damage his mother's home at 2210 Providence Avenue in order to find the illusive money, if he

did not consent to a search of her residence.

      The officers allegedly transported Mr. Ross to 2210 Providence Avenue and executed a

search of the premises.  There, according to the Newtown Township Inventory Log, the police

seized $3900 in cash, a digital scale, and various other items such as a camera and a toy.  Mr.

Ross claims that although it was not documented, among the items seized by the police during

the July search were the photographs comprising Exhibit G-20 in this trial, which the officers

testified that they had retrieved from 2115 Madison Street in April 2004.  The Court allowed the

defense to present evidence to the jury regarding this assertion, and Rene Ross testified that to

her knowledge, the photographs comprising Exhibit G-20 were also in her bedroom at the time of

the July arrest.  (Tr. 5/15/06 149-153.)  During trial, defense counsel acknowledged that Mrs.

Ross had not commenced legal proceedings regarding forfeiture of any of the property taken or

alleged  by the officers during the July search of her home.

      Based on this set of facts, Mr. Ross argues that he was deprived of his right to a fair trial

due to the following three errors: (1) the introduction into evidence of at least nine out of twelve

photographs which the Government failed to disclose prior to trial in violation of Brady v.

Maryland, 373 U.S. 83, 87 (1963) and Giglio v. United States, 405 U.S. 150, 154 (1972); (2) the

failure of the Court to allow the defense to admit bad acts evidence and evidence of bias pertaining to the Government's principal law enforcement witnesses; and (3) the Court's failure to remove Special Assistant United States Attorney Katayoun Copeland from this prosecution even though she was a necessary, material witness.

### A.   LEGAL STANDARD

Pursuant to Rule 33, a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  A Rule 33 motion for a new trial is the appropriate method for addressing allegedly erroneous evidentiary rulings.  See, e.g., U.S. v. Carter, 966 F. Supp. 336, 340 (E.D. Pa. 1997).  A new trial is warranted under this standard only if the court finds that "there is a serious danger that a miscarriage of justice has occurred," such that "an innocent person has been convicted."  U.S. v. Johnson, 302 F.3d 139, 151 (3d Cir. 2002) (citations omitted).

### C.   FAILURE TO PROVIDE PHOTOGRAPHS PRIOR TO TRIAL

A violation of Brady v. Maryland, 373 U.S. 83 (1963), is one ground for a new trial under Rule 33(a).  In Brady, 373 U.S. at 87, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is either material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady is a reminder to prosecutors that great weight must be placed not only upon obtaining convictions of those who are guilty, but also upon the importance of fair criminal trials.  Id. at 87-8.

To establish a due process violation under Brady, "a defendant must show that: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the

suppressed evidence was material either to guilt or to punishment." U.S. v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005) (quoting U.S. v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997)).  The "Brady duty" extends to favorable evidence that is either impeaching or exculpatory.  Youngblood v. W. Va., 126 S. Ct. 2188, 2190 (2006) (citing U.S.v. Bagley, 473 U.S. 667, 676 (1985)).  As to the element of materiality, a defendant must show that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Id.  (quoting Strickler v. Greene, 527 U.S. 263, 280 (1999)).  Thus, reversal is warranted only upon a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.  (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

Mr. Ross argues that his due process rights were violated by the Government's improper "suppression" of nine out of the twelve photographs the officers recovered from the bedroom in 2115 Madison Street and entered into evidence as Exhibit G-20.  Despite Mr. Ross's pre-trial request for Brady material, the Government concedes that it produced only three of the twelve photographs comprising Exhibit G-20 in the discovery package sent to defense counsel in September of 2005.

Substantively, all twelve of the photographs comprising G-20 are similar.  Nine of the photographs depict Mr. Ross's daughter, one photograph is a "gag photograph" of Mr. Ross himself, one is of father and daughter, and the last photograph depicts an unidentified woman. The three photographs that were provided in a timely manner by the Government were a cross-section of the whole, and included one photo of Mr. Ross and his daughter, one photograph of his daughter by herself, and the "gag photograph" of Mr. Ross.

The record clearly indicates that the Government marked Exhibit G-20 and provided it for inspection to Mr. Ross, prior to the commencement of Mr. Ross's direct case, on the second day of the five day trial. (Tr. 5/12/06 4:3-17).  Mr. Ross and his counsel reviewed and examined each photograph on this date, and the Government subsequently introduced the twelve photographs into evidence at trial during its case-in-chief without objection from the defense.

Mr. Ross does not argue that the contents of the "suppressed" photographs are substantively exculpatory or impeaching.  Instead, he argues that the late production of the photographs in and of itself has exculpatory value.  Mr. Ross's theory is that the delayed production of the photographs is evidence that the officers recovered the photographs from 2210 Providence Avenue during his second arrest on July 29, 2004 and not from 2115 Madison Street on April 23, 2004.  The value of the evidence for this purpose is minimal.  The fact of the delayed production might corroborate Mr. Ross's theory as to the origins of the photographs if the police had conducted the search of 2210 Providence Avenue after the Government produced its discovery package.  However, the July 29, 2004 arrest occurred long before the Government exchanged the insufficient discovery package with the Defendant on September 14, 2005.  Therefore, the Court concludes that, while unfortunate and avoidable, the delay in production is not in and of itself exculpatory or impeaching evidence.

Even if it were, it is doubtful that the Government's late production of the photographs can even be considered a "suppression" under Brady.  In United States v. Johnson, 816 F.2d 918, 924 (3d Cir. 1987), the Court of Appeals held that "[w]here the Government makes Brady evidence available during the course of a trial in such a way that a defendant is able effectively to use it, due process is not violated and Brady is not contravened."  The mere failure to turn over

exculpatory material *before* trial is not in itself a <u>Brady</u> violation.  See <u>U.S. v. Gordon</u>, 844 F.2d 1397, 1403 (9th Cir. 1988) (finding that "[t]o escape the <u>Brady</u> sanction, disclosure 'must be made at a time when disclosure would be of value to the accused'") (quotations omitted).

The Court sees no "reasonable probability" that had Mr. Ross received all twelve of the photographs instead of only three of them prior to the start of the trial he would have been acquitted of any of the drug trafficking or firearms charges.

Mr. Ross also makes cursory reference to Rule 16 of the Federal Rules of Civil Procedure, though he declines to support the reference with argument to the applicability of the Rule to the present scenario or any authority in support of the same.  Rule 16 (a)(1)(E) of the Federal Rules of Criminal Procedure provides that "[u]pon a defendant's request, the Government must permit the defendant to inspect and to copy . . . photographs . . . if the item is within the Government's possession, custody, or control and . . . (ii) the Government intends to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E).   The Government does not dispute that the nine photographs were discoverable and untimely produced.  However, the prosecution contends, and the Court agrees, that the late production of nine photographs is not cause for the grant of a new trial in this case.

Rule 16(d)(2) addresses the failure of a party to comply with a discovery request.  Under this provision, the Court  "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."  Fed. R. Crim. P. 16(d)(2).  Our court of appeals held that "the Rule does not require a district court to do anything" but "merely states that the court 'may' take such actions.'"  <u>U.S. v. Lopez</u>, 271 F.3d 472, 483 (3d Cir. 2001).  In

considering whether the failure of the Government to produce a written summary of expert testimony prior to trial warranted reversal, the <u>Lopez</u> court found that "the Government's failure to comply with Rule 16 only compelled reversal where the appellant 'demonstrate[d] prejudice to substantial rights [where] [t]he prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the Government complied with the discovery rules, not had the evidence [been] suppressed.'" <u>Id.</u> at 483-84 (quoting <u>U.S. v. Mendoza</u>, 244 F.3d 1037, 1047 (9th Cir. 2001)).

Though <u>Lopez</u> involved the failure of the Government to produce required summaries of expert testimony prior to trial, the Court sees no reason to apply a different standard than that used in <u>Lopez</u>, and concludes that the Government's untimely production of nine of the photographs comprising Exhibit G-20 did not result in a verdict that would otherwise have been changed had the Government complied with proper procedure.

### D.   REVERSE 404(B) AND BIAS EVIDENCE

Mr. Ross next argues that a new trial is warranted because the Court erroneously excluded evidence of certain "bad acts" perpetrated by the testifying police officers pursuant to Federal Rule of Evidence 404(b).

Prior to trial, Mr. Ross moved <u>in limine</u> to admit evidence of the circumstances of his arrest on July 29, 2004 for illegal drug distribution activities.[9]  At that time, at trial, and again in the present motion, Mr. Ross argued that the evidence supported his core defense theory, namely, that the Delaware County Task Force Officers "targeted" him for "pretextual reasons," and that

---

[9]In the motion <u>in limine</u>, Mr. Ross also sought to introduce evidence of an encounter between him and various Chester City police officers that took place on December 8, 2003.  It appears that he does not renew his argument regarding this evidence in his post-trial motion.

the evidence of the officers' conduct in July 2004 demonstrates how these officers "operated" in carrying out their responsibilities in drug enforcement.  The Court denied the motion, but permitted Mr. Ross to endeavor to offer the proposed evidence at trial, if relevant.  (Docket No. 48.)

At trial, Mr. Ross sought to cross-examine Detective Newell, and present other witnesses to testify regarding the July arrest.  In determining whether the evidence was admissible pursuant to Rule 404(b), the Court conducted the requisite tests for relevance and probative value under Rules 402 and 403 of the Federal Rules of Evidence, and ultimately prohibited Mr. Ross from offering the evidence.  (Tr. 5/11/06 125-128.)  Again in the present motion, Mr. Ross alleges that the actions of the police officers on July 29, 2004 are probative of the animus they possessed against him, and their motive, intent, opportunity, preparation and plan to manufacture inculpatory evidence to support his conviction arising out of the April 2004 arrest, and thus that the evidence is admissible as so-called "reverse" 404(b) evidence.

"Reverse," or "non-defendant" 404(b) evidence is used to exonerate rather than to incriminate a defendant.  U,S. v. Reed, 173 F. App'x 184, 188 (3d Cir. 2006) (citing U.S. v. Stevens, 935 F.2d 1380, 1402 (3d Cir. 1991)).  This "rarely used" variant of Rule 404(b) is most commonly employed by a defendant in order to support the theory that a third party, and not the defendant, committed the crime charged.  U.S. v. Murray, 474 F.3d 938, 939 (7th Cir. 2007) (describing reverse 404(b) evidence as that offered to "shift the blame" to a third party).  Just as evidence proffered pursuant to Rule 404(b) may not be used as improper evidence of character, so too, reverse 404(b) evidence must not be used to show propensity.  U.S. v. Williams, 458 F.3d 312, 315-16 (3d Cir. 2006) (citing 2 Wigmore on Evidence § 304, at 252 (J. Chadbourn rev.

ed. 1979)).

The purported use of the "reverse 404(b)" evidence in this case is atypical.  Although Mr. Ross has not pointed to any case law where a defendant has offered reverse 404(b) evidence for any purpose other than to point the finger at another alleged perpetrator of the charged crime, the Court sees no compelling reason that reverse 404(b) evidence should necessarily be limited to that scenario.  In this Circuit, as well as in others, reverse 404(b) evidence is defensive evidence that "tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him."  U.S. v. Montelongo, 420 F.3d 1169, 1174 (10th Cir. 2005).  Thus, the unusual use of the Rule does not end the inquiry as it seems that there is no material difference between the more typical cases in which defendants attempt to introduce reverse 404(b) evidence, and this one.  In both instances a defendant is attempting to introduce "other acts" as exculpatory evidence.

As in the case of ordinary 404(b) evidence, a three factor test governs the admissibility of reverse 404(b) evidence.  The evidence must (1) have a proper evidentiary purpose; (2) be relevant under Rule 402, and (3) not be substantially outweighed by Rule 403 concerns, such as confusion of the issues, misleading the jury, delay or waste of time.[10]  U.S. v. Butch, 256 F.3d 171, 175 (3d Cir. 2001).  If the evidence is admitted, the Court must instruct the jury as to the applicable limitations for its consideration.  Id.

Despite the efforts of counsel in reciting the laundry list of permissible uses of character

---

[10]Because the evidence is ostensibly used for exculpatory purposes, the Court does not consider whether it is prejudicial to the defendant.  U.S. v. Miller, 2004 WL 2612420, at *2 (E.D. Pa. Nov. 16, 2004) (citing Stevens 935 F.2d at 1403)).

evidence, e.g., motive, intent,[11] opportunity, preparation, plan and bias, Mr. Ross does not clearly

articulate how each of these components supports or helps form a basis for his argument as to the

admissibility of the events of the July arrest.  See U.S. v. Harvey, 845 F.2d 760, 762 (8th Cir.

1988) (finding that broad laundry list references to the grounds for admissibility under 404(b) are

inappropriate and that the court should require the party invoking the rule to explain clearly its

404(b) analysis).

The proffered  reasoning underlying Mr. Ross's assertion of the admissibility of the

evidence is as follows:

> The evidence was relevant because it would have shown that these officers,
> all of whom were involved in the arrest and search at 2115 Madison Street on
> April 23, 2004, were: ((1) familiar with Mr. Ross and his family prior to the
> search; (2) had a very contentious relationship with Mr. Ross prior to the
> search; (3) had ulterior motives for connecting him to the drugs and firearms
> confiscated from 2115 Madison Street; and (4) continued to harass Mr. Ross
> and his family several months after the search.  Moreover, this evidence of
> bad acts and bias would have undermined the officers' credibility by
> illustrating to the jury how these officers had the motive, intent, opportunity,
> preparation and plan to manufacture inculpatory evidence – such as the
> photographs – against Mr. Ross. The similarity between the bad acts
> committed by these police and narcotics officers in July of 2004, and the
> misconduct Mr. Ross contends these same officers committed in April of
> 2004, was crucial evidence with respect to how these officers "operated" in
> carrying out their responsibilities as officers charged with getting drugs off
> the streets of Chester City. It would have also shown how they worked
> together, as a "team," to implicate Mr. Ross in criminal activity at every
> opportunity.

(Def.'s Mot. 20.)

––––––––––––––––––––

[11]The admission of evidence under the "intent" element of Rule 404(b), requires that intent must be an element of the crime charged and the evidence must help to explain the defendant's intent to commit the crime.  U.S. v. Himelwright, 42 F.3d 777, 782 (3d Cir. 1994). Although Mr. Ross makes reference to the admissibility of the evidence of his July arrest as evidence of the "intent" of the officers, this exception to the prohibition against propensity evidence is not applicable to the present evidentiary argument.

The evidence of the "bad acts" of the officers during Mr. Ross's subsequent arrest in July 2004 is of no probative value to the familiarity and relationship between the police and Mr. Ross prior to the April arrest.  It is also apparent that the subsequent "bad acts" of the officers did not supply the officers with any "ulterior motive" to manufacture evidence.  Similarly, Mr. Ross's later arrest and the conduct of the police is ill-fitting to his theory that the series of arrests amounted to the plan of the officers to fabricate evidence or incriminate Mr. Ross.  Mr. Ross does not contend that any of the specific bad acts perpetrated by the police in July were also incumbent in his April arrest.[12]

Moreover, the evidence of the bad acts of the officers is not properly admitted for the purpose of showing how they "operated" in general to support the inference that because the police committed bad acts on one occasion, they are more likely to have committed improper conduct during the April 2004 arrest, or before the Court in testifying, is an impermissible use of character evidence to show a propensity to certain conduct.  This is exactly the type of propensity evidence that Rule 404(b) prohibits.  Williams, 458 F.3d at 314.

Inasmuch as the July 29, 2004 arrest may have been relevant to the alleged opportunity of the officers to fabricate evidence, the Court permitted the defense to recall Rene Ross to testify to the fact that the officers searched her home in July 2004 and had the opportunity at that time to seize the photographs.  Ms. Ross testified that law enforcement personnel searched her home at

---

[12]At trial defense counsel argued that there were "improprieties" in the April 23, 2004 search of 2115 Madison Street, "in terms of where they're saying that, for example, evidence was found, and where they located evidence, what evidence was in the car, what evidence was not in the car, what evidence was in the ceiling." (Tr. 5/11/06 121:3-13.)  There were no allegations that the officers engaged in the same acts of misconduct such as harassment or a warrantless search, nor are there allegations that any kind of police brutality or unnecessary roughness took place in April 2004.  (Tr. 5/11/06 120.)

2210 Providence Avenue on July 29, 2004, prior to which time she stated the photographs were in her bedroom.  (Tr. 5/15/06 153.)  When asked whether the photographs were in her bedroom after the search, she testified "I'm going to say no."  Id.  The jury was free to accept or reject Ms. Ross's testimony, and to include or exclude the evidence of the photographs among the indicia of residency the police testified to have recovered from 2115 Madison Street in April 2004.  Indeed, the jury was also free to conclude that, as often occurs with such memorabilia, duplicates of the family photos had existed.

Mr. Ross also argued that the evidence was admissible for the purposes of impeaching the credibility of the officers.  Specifically, Mr. Ross submits that the alleged bad acts of the officers during the July arrest proves that they were biased against him.  Proof of bias is a viable method of impeachment under the Federal Rules of Evidence, and the credibility of testifying witnesses is always relevant.  However, evidence of bias usually consists of a showing of the underlying reasons compelling a witness to testify in a particular way.  Mr. Ross has not proffered any explanation as to why the officers might bear a particular animus towards him.  The Court must observe here that, as framed, and if accepted, this argument of law enforcement bias and "targeting" would become more availing the more frequently a defendant ran afoul of the law and was caught by investigators in the same jurisdiction.  The Court will not facilitate the development of such an argument.

Nevertheless, the Court agrees that bias can result from mere contempt or dislike.  See U.S. v. Abel, 469 U.S. 45, 52 (1984) ("[b]ias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party . . . it may be induced by

-33-

a witness' . . . dislike . . . of a party"); see also Blair v. U.S., 401 F.2d 387, 389-90 (D.C. Cir. 1968) (finding that police brutality can be evidence of bias).

However, evidence of bias is still subject to balancing under Rule 403. The Court concludes that it was not erroneous to exclude the evidence of the July 29, 2004 arrest even if the evidence of the "bad acts" of the officers, as described, was at all probative of bias. Without pause, it is clear that a mini-trial would have to have been the natural consequence of the admission of the evidence. As described, the role of the proposed evidence to the issue of Mr. Ross's guilt in this case was muddled as explained to the Court; its possible confusion of issues for the jury was manifest. Therefore, the probative value of the evidence is substantially outweighed by the confusion and delay that would have ensued if the Court had permitted the defense to present evidence of a separate arrest which would have triggered the presentation by the Government of testimony and witnesses to contravene the assertions of misconduct during the second arrest.

### E.   REMOVAL OF SPECIAL ASSISTANT UNITED STATES ATTORNEY

Mr. Ross finally argues that he was denied his Sixth Amendment right to a fair trial because the Court declined to remove Special Assistant United States Attorney Katayoun Copeland from her position as trial counsel in order to allow the defense to call her as a witness.

Mr. Ross contends that Ms. Copeland was a material and necessary witness to his defense because she was present during the searches of 2115 Madison Street on April 23, 2004 and on July 29, 2004. Mr. Ross argued that she was compelled to testify to the circumstances of these searches, and in particular, to the alleged  misconduct of the officers during the July search, including the origins of the photographs comprising Exhibit G-20 and other acts of "bias" on the

part of law enforcement.[13]

The advocate-witness rule prohibits a lawyer from appearing as a witness in a case in which she is also serving as an advocate.  U.S. v. Birdman, 602 F.2d 547, 553-54 (3d Cir. 1979) (citing American Bar Association, Code of Professional Responsibility (1978)); see also Pennsylvania Rules of Professional Conduct 3.7.  In the context of a criminal prosecution, the concerns buttressing the rule are several.  One factor is that the prestige garnered by the prosecutor's office might induce a jury to accord testimonial credit to the lawyer's arguments, or conversely, that the jury may accord too much weight to her testimony itself.  Another is that the prosecutor might not enjoy full objectivity in her testimony.  Birdman, 602 F.2d at 553-54; U.S. v. Bin Laden, 91 F. Supp. 2d 600, 622 (S.D.N.Y. 2000) (citations omitted).  The salience of these dangers during a criminal prosecution have prompted courts to permit a prosecutor to testify at trial only if the offering party has exhausted all other available sources for that testimony. Birdman, 602 F.2d at 553 ("Where the prosecutor's appearance as witness is unavoidable . . . the prosecutor should withdraw from participation in the trial.").  See also Bin Laden, 91 F. Supp. 2d at 622.

Though the advocate-witness rule is intended to avoid prejudice to defendants, it is more powerfully posited to protect "a broader concern for public confidence in the process of justice" by avoiding the appearance of impropriety or misconduct on the part of attorneys.  Birdman, 602 F.2d at 554.  Thus, as a corollary to the rule, and to effect this broader purpose, a party may not seek to gain a tactical advantage by invoking the rule as a strategic tool.  In order to disqualify a

---

[13]Mr. Ross previously argued in his motion in limine that a factor supporting the necessity of SAUSA Copeland's testimony was the failure of the police to generate any paperwork to memorialize the July 29, 2004 search.  The Government subsequently provided a property receipt and other paperwork to defense counsel prior to trial.

prosecutor, the party must show a compelling and legitimate need for her testimony.  Birdman, 602 F.2d at 552; Bin Laden, 91 F. Supp. 2d at 623 (citing U.S.  v. Regan, 103 F.3d 1072, 1083 (2d Cir. 1997)).  Disqualification pursuant to the rule should take place only in "extraordinary circumstances."  Birdman, 602 F.2d at 552-53.

The present circumstances are not among the extraordinary.  As previously discussed, the evidence of Mr. Ross's July arrest was inadmissible.  Even assuming the evidence were admissible, Mr. Ross has not shown a compelling need for Ms. Copeland's testimony.  Though Ms. Copeland was personally present for certain of the pertinent events in this case, she was not solely involved in these events.  The law enforcement officers were present and testified regarding the events of April 23, 2004.  The presence of alternative witnesses undermines the compelling need for the testimony of an advocate.  Bin Laden, 91 F. Supp. 2d at 623 (finding that the presence of third parties in post-arrest interviews insulates prosecutors from being compelled to testify); see also U.S. v. Watson, 87 F.3d 927, 932 (7th Cir. 1996).

Nevertheless, Mr. Ross argues that it is the "quality" of Ms. Copeland's testimony which renders it to be both material and necessary.  By "quality," it appears that Mr. Ross does not refer to granularity, but instead to an amorphous supposition that Ms. Copeland has knowledge that corroborates the defense theory of the bias and corruption of the agents involved in investigating Mr. Ross's drug activities.  In essence, Mr. Ross contends that Ms. Copeland's testimony would lend credence to the impropriety of the conduct of the agents on  July 29, 2004, and that it would confirm that the officers removed photographs from 2210 Providence Avenue in July that they then testified to have removed in April from 2115 Madison.

Mr. Ross has offered no evidence that Ms. Copeland has any unique knowledge of the

-36-

events that transpired in April or in July to convince the Court that either her testimony is relevant evidence to bias or that her testimony is material and requires her disqualification.  Even if the Court had ruled that the evidence of bias or the bad acts of the officers was admissible, Mr. Ross has proffered no insight into how Ms. Copeland's testimony would differ from that of the officers.  Furthermore, Ms. Copeland was required by the applicable rules of professional ethics to disclose information that is contrary to the factual allegations of the Government, and by the courts to disclose any exculpatory evidence to the Defendant.  See Brady, 383 U.S. at 97. Indeed, the Court articulated that duty to counsel prior to trial when Mr. Ross first raised this argument.  There has been absolutely no indication that Ms. Copeland failed to comport with her professional obligations in any way in this regard.

### F. CUMULATIVE ERROR

Finally, having found that Mr. Ross has not shown that the Court committed a procedural or evidentiary error, the Court finds that there is no cumulative detriment to what Mr. Ross terms the "totality of the irregularities."

## IV. CONCLUSION

For the reasons set forth herein, the conviction of Mr. Ross on Counts V through X of the Superceding Indictment was supported by sufficient evidence, and Mr. Ross received a trial that comported with his constitutional rights.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  05-398** |
| | : | |
| | : | |
| **EDWARD ROSS** | : | |

## ORDER

**AND NOW**, this 31st day of August 2007, upon consideration of the Motion for a Judgment of Acquittal or New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure (Docket No. 77), the Government's Response thereto (Docket No. 83), and the Reply filed by Mr. Ross (Docket No. 84), and after oral argument regarding the Motion, **IT IS HEREBY ORDERED** that the Motion is **DENIED**.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE